The STATE of Ohio, Appellee,

v.

BARZACCHINI et al., Appellants.

[Cite as *State v. Barzacchini* (1994), 96 Ohio App.3d 440.]

Court of Appeals of Ohio,
Lucas County.

No. L–93–139.

Decided Aug. 19, 1994.

442

*Lee Fisher*, Attorney General, and *Susan E. Ashbrook*, Assistant Attorney General, for appellee.

*Douglas A. Trant*, for appellants.

*Per Curiam.*

This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas which, in pertinent part, found defendant-appellant, Kenneth J. Barzacchini, guilty of falsification of data, reports, records, manifests and other information in violation of R.C. 3734.05(G), 3734.11 and 3734.99; guilty of illegal storage of hazardous waste in violation of R.C. 3734.02(F), 3734.11 and 3734.99; guilty of obstruction of justice in violation of R.C. 2921.32; guilty of criminal endangerment in violation of R.C. 2909.06; guilty of failure to evaluate wastes in violation of R.C. 3734.11 and 3734.99; and guilty of unlawful violation of the terms and conditions of an Ohio hazardous waste facility installation and operation permit in violation of R.C. 3734.11 and 3734.99. From that judgment and the subsequent sentence, appellant now raises the following assignments of error:

"1. The trial court erred in failing to dismiss the indictments because of the cumulative *Brady* violations occurring before and during the trial.

"2. The Court erred in failing to suppress the fruits of the searches because the affidavit [*sic*] in support of the search warrants were insufficient to support probable cause and contained false and fraudulent statements as well as material

omissions under *Franks,* as well as err [*sic* ] in denying the defendant a hearing on the *Franks* issue.

"3.  The Court erred in failing to dismiss the indictments or suppress the search based on the protocol and procedures used during the search.

"4.  The Court erred in failing to dismiss the indictments because of the failure of the State to prove its chain of custody as to the samples taken from the site.

"5.  The Court erred in allowing Kevin Clouse to testify as an expert when he was not qualified as an expert and certainly not qualified to testify as an expert in any particular field.

·  "6.  The Court erred in failing to dismiss the indictment because of the accumulative prosecutorial misconduct."

The facts of this case are as follows.  Appellant Kenneth J. Barzacchini is the operator and sole shareholder of defendants XXKEM Company and American Petroleum Company, d.b.a. Lion Environmental Company ("Lion").  Lion is a hazardous waste brokerage company that transports and arranges for the disposal of hazardous and nonhazardous wastes from generators of those wastes. Lion began doing business in 1985 in Marion, Ohio.  XXKEM is a hazardous waste transportation, storage and disposal ("TSD") facility in Toledo, Ohio, which accepts hazardous wastes, blends them into fuels and then ships them to a facility authorized to burn those fuel blends.  XXKEM was incorporated in May 1987 after appellant acquired S.M. Allen, Inc., an abandoned hazardous waste storage and disposal facility.  In purchasing S.M. Allen, Inc., appellant acquired the Ohio hazardous waste installation and operation permit issued by the Ohio Environmental Protection Agency ("EPA") which allowed XXKEM to accept and store hazardous wastes.  That permit, known as a Part A permit, allowed XXKEM to store only solvent wastes classified as F001, F002, F003, F004 and F005, and ignitable wastes classified as D001.  The permit further permitted the facility to have on site at any time no more than three hundred· fifty-five-gallon drums of containerized hazardous waste.  The permit did not allow XXKEM to accept cadmium, classified as D006, lead, classified as D008, chromium, classified as D007, corrosive wastes, classified as D002, or reactive wastes, classified as D003. Therefore, on October 2, 1989, appellant submitted a revised Part A permit application to the Ohio EPA to increase the types of wastes he could accept, including metals.  In addition, earlier, appellant submitted an application to the U.S. EPA to increase the types and amounts of wastes he could accept.  Neither of those applications was ever granted.

XXKEM began accepting hazardous wastes in March 1989.  Thereafter, appellant ordered his Lion employees to transport all wastes collected from generators to XXKEM.  In July 1990, appellant moved the offices of Lion from Marion, Ohio

to the XXKEM facility and thereafter operated both businesses out of the same facility at 3903 Stickney Avenue in Toledo, Ohio.

On February 21 and March 5–9, 1991, representatives of the Ohio EPA and agents of the Ohio Attorney General's office executed search warrants of appellant's business premises at 3903 Stickney Avenue. Pursuant to those warrants, the aforementioned persons took photographs and videotapes of the premises, collected waste samples from numerous drums stacked on pads behind the building, and collected documentary evidence of appellant's, Lion's and XXKEM's business practices. Based on the evidence collected during these searches, the Lucas County Grand Jury, on February 3, 1992, returned a multicount indictment against appellant, XXKEM, Lion and Nancy Walker, the general manager of Lion, charging numerous violations of hazardous waste laws and criminal laws.

The procedural history of this case is replete with pretrial motions to suppress, to dismiss and for disclosure of evidence pursuant to *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. In pertinent part, those motions were as follows. On August 12, 1992, appellant filed, *inter alia*, motions to suppress the February 21 and March 5, 1991 searches of 3903 Stickney Ave. for lack of probable cause; a *Brady* motion to compel disclosure of any and all evidence, material, or information within the custody of the government that may exculpate the defendants or tend to establish a defense to the allegations in the indictment; and a Crim.R. 16 motion for copies of all rough notes taken by government agents during interviews with the defendants. On August 14, 1992, appellant filed an additional *Brady* request for evidence regarding the state's previous dismissal of seven counts of the indictment. Thereafter, on August 21, 1992, the state responded to the *Brady* request by asserting that, in providing discovery to the defendants, it had searched its files and had provided any exculpatory evidence found within. In addition, and in response to the defendants' request for the government's rough notes, the state provided the reports and rough notes generated by Ohio EPA and BCI employees as a result of their interviews of the defendants. Thereafter, the trial court held a hearing on the pending motions, and in an order dated September 3, 1992, the court, in pertinent part, granted the motion to compel *Brady* material, granted the specific *Brady* request as to the dismissal of six counts of the indictment, and granted the motion for the government agent's rough notes. In particular, the court ordered the state to retain all rough notes and to give to the defendants any *Brady* material in those notes. In a subsequent entry, the court denied the defendants' motions to suppress the evidence seized during the execution of the search warrants.

On October 2, 1992, appellant filed numerous *Brady* requests in which he specifically requested a number of evidentiary items which he contended contained exculpatory or impeachment information. In addition, appellant filed a

motion for an independent evaluation of the samples taken from the XXKEM facility during the execution of the search warrants. In that motion, appellant asserted that at the time of the execution of the warrants, appellant asked the state for split samples but such request was denied.

Appellant subsequently filed several amended motions to suppress the searches of his businesses, arguing that false statements were made in the affidavits supporting the requests for the search warrants. Appellant further filed additional *Brady* requests for names, addresses, telephone numbers and statements of impeachment witnesses who claimed Rodney Barnwell used a light table in the Marion office, and for any other documents in possession of the state or any of its agents regarding the issues of sampling, decontamination, health and safety, transportation, chain of custody, analysis, total consumption of samples, degradation of samples or destruction of samples involved in the searches and seizures of appellant's businesses. Appellant also filed several motions to dismiss because of prosecutorial misconduct in not disclosing *Brady* materials. Finally, appellant filed a motion to dismiss or, in the alternative, exclude the sample results in which he argued that he had requested split samples at the time of the execution of the search warrants, that the state refused to provide split samples, that the state further failed to notify him of when the samples were to be tested, thereby preventing him from having an independent analyst observe the testing, that the state further did not give him an opportunity to conduct independent analysis of the samples, and that the samples had then been consumed by testing or destroyed by degradation.

After several hearings on the pending motions, the trial court, on December 2, 1992, granted the pending *Brady* motions and denied the motions to dismiss for prosecutorial misconduct and *Brady* violations. Thereafter, in a decision and journal entry dated January 19, 1993, the court denied appellant's motion to dismiss the indictment or, in the alternative, exclude the sample results. The court reasoned that because the evidence submitted at the hearing of November 5, 1992 did not support a finding that an independent analysis of the samples would have found them to be exculpatory and because the evidence did not indicate that appellant could not reasonably have obtained comparable samples, the state did not violate any duty to preserve evidence for the defendants' independent analysis.

Finally, prior to trial, appellant filed a motion to dismiss, suppress or continue the case on the ground that the state had failed to provide complete discovery by not providing to appellant all of the test results from testing done on samples taken from appellant's business premises, and a motion to dismiss, exclude evidence or continue the case on the ground that the chain of custody records

prepared by the Ohio EPA were inaccurate in failing to disclose all persons involved in collecting samples from XXKEM, and had apparently been altered.

A lengthy trial to the bench commenced on February 1, 1993 at which the following evidence was disclosed. On August 24, 1989 and February 20, 1990 Janet Liete Miller, a hazardous waste inspector with the Ohio EPA, conducted unannounced inspections of the XXKEM facility in which she noted that the majority of the labels on the drums were for D001 or F001 through F005 wastes, but also noted the waste codes for cadmium, lead and chromium. She further noted, in addition to other problems, that precipitation had collected on the cement pads around the drums and that there was not enough room between the rows of drums on the pads. As result of these inspections, Miller mailed to appellant notice-of-violation letters in which she listed numerous violations of state regulations. Subsequently, on August 30, 1990, Miller conducted another inspection of XXKEM, although this time the inspection was announced. During this inspection, Miller noticed that the storage area was greatly improved and that although there were more than three hundred drums on the pads, many of them were labeled as nonhazardous. Other testimony at the trial below, however, revealed that prior to this announced inspection, appellant ordered his employees to change the hazardous waste labels on a number of the drums so that XXKEM appeared to be in compliance with its permit. Appellant further ordered his employees to pump rain water that had accumulated on the pads onto the ground surrounding the facility. The hazardous waste laws require that such water be tested, put in containers and properly disposed of.

Additional testimony was provided by employees of businesses who had hired Lion to handle their hazardous wastes. Ronald Seibert, the chief engineer in the development department at Goodyear Tire & Rubber Company in St. Marys, Ohio testified that from April 1989 to April 1990 he contracted with Lion to dispose of Goodyear's hazardous waste. Previously, he had met with Rodney Barnwell, Lion's representative, and provided him with analytical reports for Goodyear's wastes. He further told Barnwell that the lead level in the wastes exceeded the permitted limits. Subsequently, when he received the material characterization data sheet or manifest for the wastes, the sheet did not include lead and was not consistent with the information he had given Barnwell. Nevertheless, Seibert signed the form before the wastes were hauled by Lion. In addition, before the wastes were hauled, Seibert numbered and put hazardous waste labels on the drums which properly indicated the contents. In particular, the labels indicated that the drums contained D001, D008, F002, F003 and F005 wastes. Next, Theodore Sushka, a former employee of the Ohio Department of Transportation testified. He too was responsible for disposing of hazardous wastes in the Marietta, Ohio area and he too had contracted with Lion through

Barnwell for hauling and disposal services. ODOT wastes were primarily D001, D007 and D008 wastes; however, the wastes listed in the manifests provided by Lion did not include D007 and D008 codes. Nevertheless, he too signed the manifests and allowed Lion to remove the wastes.

Further testimony was provided by former employees of Lion and XXKEM. Rodney Barnwell testified that appellant took a very active role in running Lion and had the final say on all issues. He further stated that appellant instructed him to solicit generators of flammable wastes because appellant could make more money. As to wastes from Goodyear and ODOT, lab reports indicated that the wastes were high in lead; therefore, appellant instructed Barnwell to write "below allowable limits" on the manifests and to falsify information on the documents so that XXKEM could accept the wastes and appellant could make more money.

William Haun, the general manager of XXKEM from September 1989 to November 1990, testified that when Lion moved to XXKEM, appellant and Nancy Walker took over the day-to-day operations of the facility. He further stated that when he first met appellant, appellant told him that XXKEM could accept any kind of hazardous waste. During his tenure, approximately ninety-five percent of all the wastes received by XXKEM came from Lion; however, there was no lab at the facility and XXKEM never did anything to verify the information on the profile sheets provided by generators. He then relayed the incident prior to the August 1990 inspection in which appellant ordered him and other employees to change the hazardous waste labels and pump pad water onto the ground. At the subsequent inspection, appellant falsely told Miller that the pad water had been pumped into drums and disposed of. In addition, Haun stated that the pad water was never sampled before it was pumped onto the ground. Haun further stated that when drums would be opened for blending, the contents would often splash onto the ground when they were being poured into the blending tank. During one instance, a chemical reaction occurred when wastes were improperly mixed. Finally, he stated that for transporters other than Lion, appellant instructed Haun and the other employees to pull samples from the drums so it appeared to the truck drivers that XXKEM knew what it was doing. Those samples, however, were never tested. Kevin Vickers, another former employee of XXKEM, gave testimony that was substantially consistent with Barnwell's testimony. He further testified, however, that appellant once said that if the EPA found out he was pumping rainwater onto the ground they would take him away in handcuffs.

Other evidence admitted at the trial below revealed that during the execution of the search warrants, the EPA collected approximately ninety samples from various drums at the XXKEM facility. Test results on those samples revealed

that appellant had accepted wastes which his permit did not allow, including lead and chromium, and that the drum labels and manifests covering these wastes did not accurately describe the drum contents.

Based on the above evidence, as well as the transcript of appellant's own testimony before the grand jury, the trial court on February 19, 1993 found that appellant had recklessly and knowingly violated the laws under which he was convicted. Appellant was subsequently sentenced for those convictions and this appeal follows.

■ We will first address the second assignment of error, in which appellant contends that the trial court erred in failing to grant his motions to suppress the evidence seized from his business premises. In particular, appellant argues that the affidavits in support of the search warrants were insufficient to support a finding of probable cause in that they contained false and fraudulent statements and material omissions. In this same vein, appellant argues that the lower court erred in denying his request for a hearing pursuant to *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, in that he made a preliminary showing that the warrant affidavit contained false statements made knowingly and intentionally or with reckless disregard for the truth and that those false statements were necessary to the court's finding of probable cause.

The Supreme Court of Ohio in *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, set forth our standard of review in reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.* at paragraph two of the syllabus.

In *George*, the court based its holding on the United States Supreme Court's decision in *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, and further held:

"In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v.*

*George, supra,* at paragraph one of the syllabus, quoting *Illinois v. Gates, supra,* at 238–239, 103 S.Ct. at 2332–2333, 76 L.Ed.2d at 548–549.

Accordingly, the question before this court is whether the affidavits provided a substantial basis for the magistrate's conclusion that there was a fair probability that evidence of appellant's violation of the hazardous waste laws would be found by a search of the XXKEM facility.

Both of the affidavits at issue were sworn to by Clifford Morton, an investigator in the Special Investigations Section in the Division of Emergency and Remedial Response at the Ohio EPA. The affidavits are substantially similar except that the affidavit of March 5, 1991 refers to evidence found during the execution of the February 21, 1991 search warrant. In the affidavits, Morton asserts that in July 1990, Pam Doerner of the Ohio EPA Emergency Response Unit received an anonymous complaint that appellant was ordering his employees to discharge contaminated liquids from the drum storage pads onto the ground adjacent to the XXKEM facility, that drums were being mislabelled, and that appellant was accepting hazardous wastes that were not covered by his permit. Thereafter, Janet Liete Miller conducted a site inspection of the XXKEM facility but was unable to verify the allegations. Subsequently, in January 1991, two former employees of appellant, who then wished to remain anonymous but who were subsequently identified as William Haun and Kevin Vickers, contacted Miller and indicated that they wished to be interviewed about appellant's waste handling practices.

On January 18, 1991, Morton, Miller and John Wellman from BCI met with Haun and Vickers who stated that employees of Lion were ordered to falsify hazardous waste manifests and other documentation before transporting wastes to XXKEM, that when nonpermitted wastes came to the XXKEM facility appellant instructed his employees to fill out false profile acceptance sheets and mislabel the drums, and that the false files were kept in the file cabinets. Both of these former employees further stated that they were personally trained to mishandle the wastes and in particular were told in July and October 1990 to bail water that had accumulated on the pads onto the ground. Both informants also reported that appellant consistently stored at XXKEM more drums and more amounts of hazardous waste than his permit allowed.

Morton further attested that during a drive-by of XXKEM on February 13, 1991, he personally observed more than seven hundred drums on the three pads and that appellant's permit only allows him to have three hundred drums of hazardous waste on site at a given time. Morton next attested to information learned from Janet Liete Miller. Miller inspected XXKEM on August 24, 1989, February 28, 1990 and August 30, 1990 during which she noted that appellant was in violation of numerous U.S. and Ohio EPA rules and regulations and thereafter

sent notice of violation letters to appellant. Miller, however, told Morton that appellant never responded to the letter. Finally, Morton attested that on February 20, 1990 he spoke with a former driver for Lion who confirmed the described practices of dumping contaminated rainwater, altering hazardous waste manifests and accepting unpermitted hazardous wastes.

Based on these facts, Morton asserted that he had probable cause to believe that appellant and the corporate defendants were operating the businesses in violation of R.C. Chapter 3734. Morton then gave a detailed list of the materials he believed could be found at the facility and which would confirm the violations.

In attacking the sufficiency of the affidavits, appellant contends that the affidavits failed to show the basis of knowledge or veracity of the informants and that the informants were not reliable because they were disgruntled former employees. Therefore, their allegations alone were not enough to provide probable cause and required corroboration by an independent police investigation or some other means.

While the independent police investigation in the case below failed to corroborate the precise criminal violations alleged by the informants, it did corroborate other statements made by the informants. Moreover, as the confidential informants were three former employees, they clearly had a basis for their knowledge, and the fact that the three former employees told the same story is corroboration in and of itself. Finally, appellant had been charged with violations following previous inspections. Given these facts, we conclude that the issuing magistrate had a substantial basis for concluding that there was a fair probability that evidence of violations of hazardous waste laws would be found at the XXKEM facility, and the search warrants were properly issued.

■ Under the first assignment of error, appellant further contends that the court erred in failing to conduct a hearing on the issue of whether the affiant lied or was reckless with the truth. In *Franks v. Delaware, supra*, the United States Supreme Court held:

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.*, 438 U.S. at 155–156, 98 S.Ct. at 2676, 57 L.Ed.2d at 672.

Pursuant to this standard, appellant, at the August 27, 1992 hearing on the motion to suppress, asserted that the affidavits contained material omissions, fraudulent allegations and false statements. Because the court had already determined that the affidavits established probable cause for the search warrant,

appellant proffered evidence which he claimed established the defects in the affidavits. In part, appellant proffered evidence that the affidavits failed to inform the court that appellant had applied to the U.S. EPA for a permit that would allow him to accept hazardous wastes not listed under his present permit; that the former employees whom Morton interviewed began working for appellant in September 1989, not March 1989 as alleged in the affidavit; and that if appellant were allowed to testify, he would state that the allegations in the affidavits regarding his instructions to his employees were false, that he did in fact respond to Janet Liete Miller's notice of violation letter, that the former driver's allegations were false, and that William Haun, the confidential informant who was fired, managed XXKEM for a significant period of time while appellant was living in Marion and changed files on his own.

Under *Franks*, the court specified that "[t]he deliberate falsity or reckless disregard whose impeachment is permitted today *is only that of the affiant, not of any nongovernmental informant.*" (Emphasis added.) *Id.*, 438 U.S. at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682. The bulk of the allegations of falsity made by appellant clearly attack the veracity of the nongovernmental informants; they do not attack the veracity of the affiant himself. Moreover, appellant's own assertions that he did not direct his employees to violate the hazardous waste laws go to the merits of the indictments themselves and cannot be viewed as "reliable statements of a witness" which amount to an offer of proof to challenge the veracity of the warrant affidavits. *Id.* Next, that appellant had filed an application to the U.S. EPA to expand his permit is irrelevant to the issue of whether he violated Ohio hazardous waste laws. Finally, that the affidavit misstated the dates on which the confidential informants began working for appellant cannot be deemed a false statement made knowingly, intentionally or with reckless disregard for the truth absent some evidence that the affiant, Morton, knew or should have known that the dates were not correct. The independent investigation by Morton and his colleagues confirmed a number of the statements made by the informants, so there was no reason to believe that the informants had misstated the dates of their employ. Because appellant failed to make a substantial preliminary showing that the affiant himself made a false statement knowingly and intentionally, or with reckless disregard for the truth, the trial court did not err in denying appellant's request for a *Franks* hearing.

Accordingly, the second assignment of error is not well taken.

In his first assignment of error, appellant contends that the trial court erred in failing to dismiss the indictments because of the cumulative *Brady* violations occurring before and during the trial.

█ In *Brady v. Maryland, supra*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.,* 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218–219. This rule has been further extended to include impeachment evidence. *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. Any *Brady* evidence, however, will be deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *Bagley, supra.* "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Where, however, the evidence is revealed in time for the defense to use it effectively at or before trial, no constitutional violation has occurred. See *United States v. Presser* (C.A.6, 1988), 844 F.2d 1275, 1283.

In the present case, appellant specifically identifies several instances in which, despite repeated requests by appellant, the state failed to disclose evidence favorable to the accused only to be later ordered to do so by the court.

■ At the August 27, 1992 hearing, appellant specifically requested information regarding any promises, inducements, incentives or agreements the state had made with potential witnesses in return for their testimony. Despite the court's order to reveal such information, appellant learned for the first time at the trial below that the state had promised not to pursue criminal charges against its witness Ronald L. Seibert. Seibert was the chief engineer in the development department at Goodyear Tire & Rubber Company in St. Marys, Ohio. At the trial below, Seibert stated that he used Lion to dispose of the waste from April 1989 to April 1990, that the waste included lead which exceeded the Resource Conservation and Recovery Act ("RCRA") permitted limits, but that when he received the material characterization data sheet from Lion listing the contents of Goodyear's waste, the sheet did not include lead and was not consistent with information he had given Lion's representative, Rodney Barnwell. Nevertheless, Seibert signed the sheet. Upon discussions between the court and the parties, the state revealed that it had no intention of bringing criminal charges against Seibert. Seibert's counsel, however, approved Seibert's testifying only after the state, prior to trial, revealed that it had no intention of prosecuting Seibert. Under these circumstances, the court found that the state had violated *Brady* by failing to disclose the inducement, but denied appellant's motion for a mistrial. We agree with the court's ruling. Although the information was impeachment evidence, appellant had ample opportunity to use it at trial. Moreover, the trier of fact, in this case the court, did learn of the inducement and could use it in judging the credibility of Seibert. Finally, we cannot say that the evidence, if revealed to appellant prior to trial, would have changed the outcome of the trial.

■ Appellant further asserts that despite his earlier requests for additional *Brady* material, and the state's previous denials that any existed, the state failed to turn over to appellant a statement of Carol Adamovich and a field report of her interview with the Ohio EPA authorities until October 5, 1992. Appellant contends that because these were *Brady* material, the state's failure to disclose it hampered him in the preparation of his pretrial motions. Even if the state's untimely revelation of this evidence hampered appellant's pretrial preparation, we fail to see how it would have changed the outcome of the trial, particularly given that appellant had the evidence prior to trial and could have used used it if he so chose.

■ Appellant further asserts that the state failed to timely reveal evidence that Rodney Barnwell used a light table at XXKEM, that the state failed to provide complete and accurate test results as to samples of allegedly hazardous waste seized from XXKEM, and that the state failed to provide appellant with a booklet seized from XXKEM which included a copy of the permit which lists all wastes XXKEM was permitted to accept. A review of the record reveals that prior to trial the evidence regarding Barnwell's use of the light table was revealed to appellant, as were accurate copies of test results. Regarding the booklet, appellant already knew or should have known what types of hazardous wastes he was permitted to accept. Therefore, his access to the actual permit would not have changed the outcome of the trial.

■ Finally, appellant contends that in her deposition of October 26, 1992, Janet Liete Miller stated that she never told Clifford Morton that appellant answered her notice-of-violation letter. At trial, however, Miller testified that appellant did respond in writing. Appellant asserts that this difference in testimony somehow violated *Brady*. We fail to see how this evidence falls within the ambit of *Brady* material. Appellant had the sworn testimony of Miller and used it to attempt to impeach her at trial.

Accordingly, we conclude that none of the evidence listed above was material to the outcome of the trial and, therefore, the first assignment of error is not well taken.

■ In his third assignment of error appellant contends that the trial court erred in failing to dismiss the indictments or to suppress the searches based on the protocol and procedures used during the searches. Specifically, appellant argues that the court erroneously allowed the state to introduce the test results of waste samples into evidence when, despite his request for same, appellant was not given an opportunity for split samples or to independently test the samples in the state's possession. This inability to verify the results of the state's chemical

analysis, appellant contends, deprived him of his right to pretrial discovery and due process of law.

The duty of the state to preserve evidence for independent testing by a defendant is well settled:

"[T]he Due Process Clause of the Fourteenth Amendment does not require the prosecution to preserve [evidence] samples for independent analysis unless the samples possess an exculpatory value that is apparent before the sample is destroyed, and the defendant is unable to obtain comparable evidence by other reasonably available means." *State v. Estep* (1991), 73 Ohio App.3d 609, 612, 598 N.E.2d 96, 97–98. See, also, *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413. Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood* (1988), 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289.

The trial court below relied on *Trombetta* and *Youngblood* in denying appellant's motion to exclude the sample results from evidence. The court concluded that although the sampling and subsequent analysis may have been performed with insufficient care to ensure reliability, it did not follow that the samples tested independently would have been exculpatory. Moreover, the court found that appellant had presented no evidence that in the months between the end of the second search and the time when chemical changes in the samples made further analysis irrelevant appellant made any effort to obtain or test samples from the drums which remained in their possession. Upon review of the evidence presented at the November 5, 1992 hearing on this issue, we agree with the trial court's ruling.

At the hearing below, Tony Burke, appellant's son-in-law and the general manager of XXKEM at the time of the searches, testified that during the searches he asked Clifford Morton about getting split samples. After discussing the issue with Morton, the two agreed that Morton would provide appellant with an inventory so that he could collect his own samples for testing. In addition, Craig Kleinhenz testified that after collecting samples from the drums he marked the drums and gave an inventory of the samples taken to representatives of XXKEM.

Appellant now contends that he was never able to conduct independent sampling because after the searches he was instructed to stay off the pads. However, Burke testified below that he was not allowed to be on the pads *without an official from the Ohio EPA present.* Appellant did not present any evidence that he attempted to get an Ohio EPA official to accompany him to the pads for sampling. In fact, appellant presented no evidence whatsoever that he attempted to conduct any independent sampling. Nevertheless, we note that under Ohio

Adm.Code 3745–54–13 appellant is required to obtain a detailed chemical and physical analysis of the wastes before they are brought into his facility for storage and eventual disposal. As such, he is required to have on hand at all times an accurate listing of the contents of the drums. Given this requirement, appellant should have already been aware of any exculpatory information and could have used that in cross-examining the state's witnesses on sampling.

Accordingly, we find the third assignment of error not well taken.

In his fourth assignment of error, appellant asserts that the trial court erred in failing to dismiss the indictments because of the failure of the state to prove its chain of custody as to the samples of hazardous waste taken from XXKEM during the execution of the search warrants. Specifically, appellant contends that the chain of custody records prepared by the Ohio EPA and given to KEMRON for testing indicate only two persons, Dan Imhoff and Clifford Morton, as the persons responsible for obtaining samples for testing from XXKEM on February 21 and March 5–9, 1991, respectively. Other evidence, however, reveals that several other persons, Shane, Kleinhenz, Clouse, Link and Palmer, were involved in collecting samples during the execution of the search warrants. Appellant further contends that the chain of custody records provided to him appeared to have been altered because the chain of custody record entered as an exhibit contains additional statements from the record provided to him in discovery.

Chain of custody is an aspect of the authentication and identification requirement of Evid.R. 901, which states:

"(A) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

"(B) Illustrations. * * *the following are examples of authentication or identification conforming with the requirements of this rule:

"(1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be.

" * * * *

"(9) *Process or system.* Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

When evidence is to be used to prove some fact, it is not competent evidence unless it is shown to be in essentially the same condition as when it was discovered. *Gutman v. Indus. Comm.* (1942), 71 Ohio App. 383, 385, 26 O.O. 302, 303, 50 N.E.2d 187, 188. The relevancy of authentication and identification is to

connect prospective evidence to the issues and people involved in a trial. *Bross v. Smith* (1992), 80 Ohio App.3d 246, 251–252, 608 N.E.2d 1175, 1178, 1180.

Although the burden of establishing the chain of custody of a particular piece of evidence is on the state, the burden is not an absolute one. *State v. Moore* (1973), 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268, 353 N.E.2d 866, 870. As long as it is reasonably certain that no tampering or substitution occurred regarding the particular item of evidence, the state need not negate all possibilities of tampering or substitution. *Id.* See, also, *State v. Blevins* (1987), 36 Ohio App.3d 147, 150, 521 N.E.2d 1105, 1109; *Avon Lake v. Anderson* (1983), 10 Ohio App.3d 297, 10 OBR 472, 462 N.E.2d 188. Moreover, even when a break in the chain of custody is uncovered, it goes to the credibility of the evidence and not to its admissibility. *Blevins, supra,* at 150, 521 N.E.2d at 1109, citing *Columbus v. Marks* (1963), 118 Ohio App. 359, 25 O.O.2d 228, 194 N.E.2d 791.

At the trial below the state established that immediately after the execution of the search warrants, Dan Imhoff on February 21, 1991 and Clifford Morton on March 5–9, 1991 maintained custody of the samples retrieved from the hazardous waste drums until they relinquished custody to Harry Brennan of KEMRON. In addition, Brenda Gregory, the sample custodian at KEMRON, and Janet Williams, the senior sample coordinator, testified that they received the samples intact from Harry Brennan. Given this sequence of events, we cannot say that the state failed to establish its chain of custody as to the waste samples. As to appellant's argument regarding the differences in the chain of custody records, we conclude that this goes to the weight of the evidence and not to its admissibility. Accordingly, the trial court did not err in failing to dismiss the indictments for the state's alleged failure to establish the chain of custody, and the fourth assignment of error is not well taken.

In his fifth assignment of error, appellant asserts that the trial court erred in allowing Kevin Clouse to testify as an expert when he was not qualified as such and when the court did not specifically determine that he was qualified to testify as such. "Rulings concerning the admissibility of expert testimony are within the discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion." *Frank v. Vulcan Materials Co.* (1988), 55 Ohio App.3d 153, 155, 563 N.E.2d 339, 342. Therefore, only where the court's determination indicates that its attitude was unreasonable, arbitrary or unconscionable will we reverse the evidentiary ruling on appeal. *Id.*

At the trial below, Kevin Clouse, the section manager of the Special Investigations Unit of the Ohio EPA, was called to testify. Initially, the prosecutor questioned him in detail about his background and experience. During this questioning, appellant objected on the grounds of relevancy. In response, the

state stated that it was going to offer Clouse as an expert. The court then overruled appellant's objection. Clouse testified as to basic hazardous waste sampling procedures and appropriate sampling procedures and tools. He further stated that during the course of his employ with the Ohio EPA he has been involved in the execution of approximately fifty search warrants, that he has had extensive in-house and specialized training in the hazardous waste field, including environmental criminal enforcement, which includes evidence collection and sampling, and that he has also personally instructed and developed curriculums for these courses. Subsequently, the prosecutor asked Clouse a hypothetical question to which appellant objected, arguing that Clouse was not qualified as an expert. The prosecutor asserted that Clouse was an expert in the areas of hazardous waste sampling and assessing hazardous waste sites and the court overruled the objection. Given this sequence of events at the trial, we find that the court, although not making an express determination as such, did accept Clouse as an expert witness.

█ Evid.R. 702 states:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

During the pretrial and the trial proceedings below, appellant challenged the state's protocol and procedures used in collecting the samples from XXKEM. Clouse had extensive experience in this field and his knowledge assisted the court in determining a fact in issue, namely, the reliability of the test results from the samples of wastes collected at XXKEM. Accordingly, he was properly determined to be an expert witness in the trial below, and the fifth assignment of error is not well taken.

█ In his sixth and final assignment of error, appellant asserts that the trial court erred in failing to dismiss the indictments on the ground of accumulative prosecutorial misconduct. Appellant asserts generally that the state's entire case was riddled with inconsistencies, untruths, negligence and blatant disregard for the orders of the court. Appellant does not, however, identify specific instances of misconduct.

The Supreme Court of Ohio has held that "[t]he conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400. In this light, the court has stated:

"Time and again we see [prosecutorial] misconduct which in many cases could appear to be grounds for reversal and the vacating of convictions and/or sen-

tences. In cases where the evidence of guilt is overwhelming and the statutory criteria have been met for both conviction and sentence * * * we have not chosen this alternative except in rare instances." *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556.

In the present case, there was overwhelming evidence of appellant's guilt of the crimes charged. Moreover, we note that although the state's treatment of appellant's *Brady* requests was less than admirable, we have rejected appellant's *Brady* violation claims for the reasons stated under the first assignment of error. Accordingly, the sixth assignment error is not well taken.

On consideration whereof, the court finds that the appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs are assessed to appellant.

*Judgment affirmed.*

ABOOD, P.J., GLASSER and SHERCK, JJ., concur.