OPINION
{¶ 1} Allen A. Greene was found guilty by a jury in the Montgomery County Court of Common Pleas of theft, a felony of the fifth degree, and of grand theft of a motor vehicle, a felony of the fourth degree. The court sentenced Greene to seventeen months of incarceration on the grand theft charge and to ten months of incarceration on the theft charge, to be served concurrently. Greene was required to pay restitution and court costs. The court also suspended his driving privileges for two years.
 {¶ 2} The state's evidence established the following facts:
 {¶ 3} In 2001 and 2002, Greene was a lot technician for Paul Sherry Car'n Credit, located at 7889 Brandt Pike in Huber Heights, Ohio. Greene often was responsible for taking cash and check deposits to Fifth Third Bank for the company, using a company vehicle. On Thursday, June 6, 2002, Greene's wife, Bettie Stewart Greene ("Mrs. Greene"), overheard Greene talking with his son, Allen Harris, about faking a carjacking of Greene's vehicle as he took deposits to the bank.
 {¶ 4} On June 7, 2002, the following day, Greene arrived at work at approximately 8:30 a.m. At approximately 9:50 a.m. or 10:00 a.m., Sheryl Wagoner, the Officer Manager, gave Greene a bank bag containing the cash and check deposits, which had been prepared the night before by Donna Bucholz, the Senior Office Manager/Assistant Manager. The bag contained a total of $6,550.35 in cash, checks and money orders — roughly $3,400 was cash. Greene left Paul Sherry Car'n Credit in a white 1993 Nissan SWB pick-up truck.
 {¶ 5} Greene never arrived at the bank. At approximately 10:30 a.m., Greene, who was walking north along Brandt Pike, got the attention of a Dayton police officer who was driving past and told the officer that he had been the victim of a carjacking. Greene claimed that a white male had walked up to the truck at the intersection of Taylorsville Road and Harshmanville Road in Huber Heights, pointed a gun at his face, forced him over to the passenger seat of the car, and drove him around. Later, the carjacker allegedly forced Greene to climb over into the driver's seat, and Greene was struck in the face when he did not immediately comply with the demands. Greene claimed that he was ordered out of the truck on a side street off of Bickmore Road (which is near his house on Rita Street) in Dayton. Greene repeated his story to Huber Heights Police Officer Cara Rizor and, later, to Detective Jeffrey Colvin. Colvin drove the route with Greene and took him to the Huber Heights police department, where a composite drawing of the carjacker was created and released to the media. Colvin noticed bruising on Greene's cheekbone, and Greene was seen by paramedics, who recommended that he be seen at a hospital later. Greene was driven back to Paul Sherry Car'n Credit.
 {¶ 6} At approximately 3:00 p.m., Mrs. Greene picked up Greene from his work. According to Mrs. Greene, they initially drove home and then drove up to Sidney, Ohio, where Harris resided, looking for Harris. In Sidney, Harris stated that he had left the truck at Children's Medical Center and that he had torn up the checks. Harris gave $1,200 in cash to Greene. Mrs. Greene then drove Greene to the Good Samaritan Hospital in Dayton to be treated for his facial injuries. On June 8, 2002, Mrs. Greene made two deposits into her account at Wright-Patt Credit Union — the first in the amount of $520 and the second for $150.
 {¶ 7} On June 14, 2002, John Carter, a security officer at Children's Medical Center in Dayton, contacted Paul Sherry Car'n Credit about a white pick-up truck with Paul Sherry Car'n Credit dealer tags in the doctor's parking lot. His partner, Thomas Skiles, subsequently contacted the Huber Heights police department. Skiles indicated that he had noticed the truck on June 8, 2002, and that the vehicle had been in the same spot since then. Officer Philip Green, an evidence technician with the Huber Heights police department, checked the exterior and interior of the vehicle for fingerprints. Inside the truck, the officer located the blue bank bag. Officer Green, with the assistance of Officer Raphael Schmid, processed the bag and contents for fingerprints using Ninhydrin. They sent the contents of the bag and two latent print cards containing prints from the exterior of the vehicle to the Miami Valley Regional Crime Laboratory ("MVRCL"). Using the Automated Fingerprint Identification System ("AFIS"), Ronald Huston, Supervisor of the Fingerprint/AFIS Section of the lab, examined a right thumb print and a right middle fingerprint one of the deposit slips, among other prints. Huston subsequently identified the prints on the deposit slip as belonging to Harris.
 {¶ 8} On October 25, 2002, the Dayton police responded to a call by Mrs. Greene regarding domestic violence by her husband No one was arrested at that time. During the morning of October 26, 2002, Mrs. Greene contacted Donna Bucholz regarding the carjacking. Two days later, Mrs. Greene contacted the Huber Heights police department and provided a statement to the police regarding Greene's and Harris' plan to fake a carjacking and to steal the deposits. At trial, Mrs. Greene repeatedly testified that she was afraid of her husband
 {¶ 9} On November 22, 2002, Greene was indicted for grand theft of a motor vehicle and theft of currency over $500, in violation of R.C. 2319.02(A)(2). After a jury trial, he was convicted of both offenses.
 {¶ 10} Greene raises two assignments of error on appeal, which we review in reverse order.
 {¶ 11} "B. The trial court committed prejudicial error by entering a verdict against the manifest weight of the evidence."
 {¶ 12} In his second assignment of error, Greene claims that his conviction is against the manifest weight of the evidence. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 13} Upon review of the record, we cannot conclude that the jury "clearly lost its way" in concluding that Greene had deprived his employer of its pick-up truck and had stolen the contents of the bank deposit bag. Greene asserts that the testimony of Officer Rizor supported his rendition of events. Greene claimed that, during the carjacking, the carjacker drove on Taylorsville Road past the police station and into the driveway of an apartment complex that looked like "projects." He further testified that he had made a quick turn in front of a Walgreens in an effort to attract the attention of a police cruiser parked there. During her testimony, Rizor stated that she had been doing paperwork in her cruiser in the Walgreens parking lot at the time that Greene was in the truck. Although she did not see the Paul Sherry Car'n Credit vehicle, she indicated that Greene could have done improper driving and not been seen by her. Rizor also confirmed that there were "apartment complexes where all the apartments look alike there on Taylorsville Roard just past the police department." Although Rizor's testimony is consistent with Greene's account, it is not inconsistent with the state's theory. As noted during Rizor's redirect examination, her testimony was "also consistent with someone that had been faking a carjacking and was just driving."
 {¶ 14} Greene also argues that Skiles' testimony is suspect, because the truck was in the hospital parking lot for one week before the police were notified and "any number of people may have entered it and potentially removed property." Although the truck was unlocked, we have no basis to conclude that other evidence was removed or that the evidence against Harris was placed there during the week.
 {¶ 15} Greene further argues that the state's evidence of Harris' fingerprints on items located in the deposit bag was undermined by the fact that the truck sat open for a week and the "sloppy evidence-gathering" by the police. Greene emphasizes that the evidence technician did not lift prints from the truck's steering wheel, rear view mirror, or outside mirror, which a carjacker would be likely to touch or adjust. Although prints were not discovered in those locations, Green was able to develop prints on the deposit slip which were of sufficient quality to run through AFIS for a possible match. Huston, an individual with approximately thirty years of experience as a latent print examiner, identified the fingerprints on the deposit slip as belonging to Harris after comparing them with known print samples. Richard Shipp, a self-employed forensic document examiner, also compared the prints on the deposit slip to known samples and concluded that the prints on the deposit slip belonged to Harris. Shipp indicated that there were at least twelve points of comparison for the right thumb print. Even though the truck sat in the hospital parking lot for a period of time, the jury could have reasonably concluded that deposit bag had remained in the vehicle and that the fingerprint identifications by Huston and Shipp were accurate and reliable.
 {¶ 16} Greene notes that he had frequently made bank deposits for his employer and that he had had no prior problems. He further notes that Bucholz testified that he had been a good employee and that he was cooperative in making an incident report following the carjacking. We agree with Greene that this evidence is favorable to him. However, we cannot conclude, based on this evidence alone, that the jury could not have reasonably found him guilty of the offenses.
 {¶ 17} Greene acknowledges that the lynchpin of the state's case is the testimony of Mrs. Greene, who provides the sole evidence that Greene acted in concert with Harris and that he split the money with Harris following the alleged carjacking. As he stated, "the burden of proof beyond a reasonable doubt must rise or fall upon the credibility of witness Bettie Greene." Mrs. Greene testified that, while she was in the bathroom during the evening of Thursday, June 6, 2002, she overheard Greene talking with Harris in her kitchen about planning to fake a carjacking. She stated: "He [Greene] told him [Harris] that it would be a foolproof plan, that nobody would realize that it had even happened. He would just simply say he had been carjacked. He told him at that point where he — how they would set it up and everything." Mrs. Greene further testified that her husband suggested Saturday, because Paul Sherry Car'n Credit took in the most money on that day, but Harris said "let's do it on Friday." Mrs. Greene testified that she saw Harris at her home when she left for work at 7:30 a.m. on the following morning.
 {¶ 18} Mrs. Greene further testified that during the afternoon of June 7, 2002, she received a telephone call from her husband, and she picked him up at Paul Sherry Car'n Credit. She indicated that she drove Greene to their home and then to Harris' apartment in Sidney to look for Harris. During that time, Greene allegedly stated that he had injured himself. She stated that she went into Harris' apartment with Greene, and that Greene had asked Harris where he had left the truck and what he had done with the checks. Mrs. Greene testified that Harris had stated that he had left the truck at Children's Medical Center and that he had torn up the checks and put them in a dumpster. Mrs. Greene stated that they divided the cash, with Greene receiving $1,200. Mrs. Greene testified that she drove Greene directly to Good Samaritan Hospital. She stated that she (with Greene accompanying her) deposited a portion of the money into her bank account on June 8, 2002.
 {¶ 19} Greene asserts that there are numerous problems with Mrs. Greene's credibility — she did not report the planned crime nor try to dissuade her husband from committing it; she placed the money in her personal bank account and did not return the funds to Paul Sherry Car'n Credit; she gave conflicting statements about the amount of money that she had deposited into her account; she stated that she had lost her memory for a short period of time in late October 2003; she stated that she did not report Greene prior to October 2003 because she was afraid of him but then stated that she reported him in late October because she was afraid of him; and she stated that she wanted Greene out of the way so she wouldn't have to fear for her life. We note that she testified, in particular:
 {¶ 20} "Q: And a good way to get him out of the way is to get him convicted of this crime; is that correct, ma'am?"
 {¶ 21} "A: Because I don't want to have to fear for my life."
 {¶ 22} Upon review of the record, we agree with Greene that there were a number of reasons why a jury might choose to discredit Mrs. Greene's testimony. Most notably, she admitted to being fearful of him and to wanting him out of the way. A reasonable jury could have concluded, if it wished, that she had lied to accomplish this goal, particularly in light of the fact that she reported Greene's involvement within a day of his committing acts of domestic violence against her.
 {¶ 23} Despite these shortcomings to her credibility, the jury could also have found a reasonable basis to credit her testimony. Although Mrs. Greene's statement to the police suggested that she had deposited all of the stolen money into her account whereas she testified that she deposited only a portion of the money, the bank statement corroborated her testimony that she had made two deposits totaling $670. Mrs. Greene further testified that her paychecks were direct deposited into her bank account and that she did not have large sums of cash to deposit. No contradictory evidence was presented. A jury could have reasonably inferred that the cash, which was deposited the day after the theft, was the result of the planned fake carjacking. We emphasize that we are highly deferential to the factfinder's determinations of credibility. Although the jury could have chosen not to believe Mrs. Greene, we cannot conclude that the jury "clearly lost its way" in accepting her testimony, at least to some extent. Moreover, when Mrs. Greene's testimony is coupled with the bank deposit on June 8, 2002; the fact that Greene got the attention of a police officer near to his home; the fact that the truck was located at Children's Medical Center, which is not far from his home; and the fact that his son's fingerprints were found on the deposit slip, a reasonable jury could have concluded that Greene acted with Harris to fake the carjacking of his company car and to steal the bank deposit with which Greene had been entrusted. Accordingly, Greene's conviction was not against the manifest weight of the evidence.
 {¶ 24} Greene's second assignment of error is overruled.
 {¶ 25} "A. Appellant was denied effective assistance of counsel when his trial attorney failed to properly challenge the admission of co-defendant's fingerprints at trial."
 {¶ 26} In his first assignment of error, Greene claims that his trial counsel was ineffective, because he neither objected to nor addressed in his closing argument the admissibility of Harris' fingerprint on the deposit bag and the state's failure to establish the chain of custody of that fingerprint evidence.
 {¶ 27} In order to demonstrate ineffective assistance of counsel, Greene must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance, i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id.;State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 28} Greene claimed that his trial counsel was ineffective, because he failed to object to the admissibility of the fingerprint evidence. The state responds that his counsel did, in fact, raise an objection. The record reveals that, at the conclusion of the state's case, Greene's counsel made a "general objection" to all of the state's exhibits but did not argue that any particular exhibit should not be admitted. In our judgment, Greene's counsel's general objection was insufficient to object to the admission of the fingerprint evidence.
 {¶ 29} However, we find no basis to conclude that Greene's counsel's failure to make a specific objection to the admissibility of the fingerprint evidence was prejudicial to Greene. In State v. Rajchel, Montgomery App. No. 19633, 2003-Ohio-3975, we discussed the state's burden in establishing the chain of custody:
 {¶ 30} "The State has the burden of establishing the chain of custody of a specific piece of evidence. State v. Barzacchini
(1994), 96 Ohio App.3d 440, 458, 645 N.E.2d 137. `The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' Evid. R. 901(A). In order to meet its burden in establishing the chain of evidence, `the state need only establish that it is reasonably certain that substitution, alteration, or tampering did not occur.' State v. Qualls (June 6, 1997), Clark App. No. 96 CA 68. Breaks in the chain of custody go to the weight afforded the evidence — not the admissibility of the evidence. State v. Jones (Mar. 31, 2000), Miami App. No. 99 CA 38."
Rajchel, supra, at ¶ 21.
 {¶ 31} In the present case, Green testified that he processed the documents in the bank bag within thirty minutes of removing them from the bag. He stated that, after testing the bank bag contents for fingerprints, he placed them in an envelope and sealed it. He then placed the sealed envelope, along with a lab sheet for the MVRCL, into the evidence locker at the Huber Heights police department. Green stated that two latent print cards and a roll of 35 millimeter film were submitted separately. Although Green indicated that he had not seen the evidence since he put it in the evidence locker, he testified that it appeared that other individuals had attempted to maintain the chain of custody. He testified: "You can see where it's been logged in and out of the property room to the lab, property, and then to the prosecutor, to the lab. * * * I can see initials over, half on, half off, tape on the front and the back."
 {¶ 32} Huston also testified regarding the chain of custody of the items in the bank deposit bag. He stated:
 {¶ 33} "This is the envelope that contained various paper items such as I've notated here, the deposit slips and torn envelopes and so forth; like two torn envelopes, the deposit slip and three envelopes, and this was submitted to us in this envelope to the lab. It was assigned a submission number. Here's my initials, where it was received when I examined it." Huston further testified that after an examination, evidence is normally placed back in the envelope and sealed. In particular, he stated: "After we open up their [the agency's] sealed package, we are going to seal it back up and return it back to them to preserve the chain of evidence." As for the document fingerprint evidence at issue, he testified: "There appears to be even a chain of custody that Huber Heights uses on their envelope also in regard to that, and then this bar code here would be where we keep track of th evidence in regards to our records * * * So there is a chain of custody done. There's a sealing here by us, there's a sealing here by their agency and the notations of people who, shall we say, came into possession of this evidence at some time or another."
 {¶ 34} Huston also testified that he had received two latent print cards from the Huber Heights police department as part of its submission. He indicated that, after performing a fingerprint examination, he retained those cards in the lab files until the trial.
 {¶ 35} Although the state did not present the testimony of each individual who had possession of the fingerprint evidence from the time of collection until trial (which would have been a more prudent course of action), the state has supplied testimony which demonstrates that Green quickly processed the contents of the bank bag and sealed those items in an envelope after testing them. The state further established that the MVRCL received a sealed envelope from the Huber Heights police department, which had an orange sticker indicating which individuals had had custody of the envelope. The MVRCL also resealed the envelope after examining the evidence. The sticker on the envelope further demonstrated who had custody of the envelope until trial. The lab retained the two latent print cards. (We note that, while the evidence of the chain of custody for the latent print cards is weaker than that for the bank deposit bag and its contents, the two prints which were identified as belonging to Harris were located on a deposit slip, not on the latent print cards.) In our judgment, the state satisfied its burden to a reasonable certainty that substitution, alteration, or tampering did not occur. Based on the record, we find no basis to conclude that the trial court would have deemed the fingerprint evidence inadmissible based on a defect in the chain of custody or otherwise.
 {¶ 36} We note that both Greene's and Harris' counsel cross-examined Huston about the reliability of the fingerprint evidence. Harris' counsel questioned Huston regarding his decision not to compare the fingerprints of other individuals on the ranked AFIS results list and to stop after comparing Harris' fingerprints. He also asked about why other fingerprints were not compared, about Huston's report to Colvin, and about the lack of national standards for a positive identification. Greene's counsel discovered during his cross-examination of Huston that Huston had not returned the latent print cards to the police or the prosecutor. He further asked about whether there were positive comparisons for palm prints on the latent print cards. Accordingly, we find no prejudice to Greene in his counsel's failure to make a specific objection to the admissibility of the fingerprint evidence based on the state's alleged failure to establish an unbroken chain of custody.
 {¶ 37} Greene also complains that his trial counsel did not challenge the fingerprint evidence during his closing arguments. Reading each of the parties' closing argument, we find no fault with Greene's attorney's approach. Harris' attorney gave his closing argument before Greene's attorney. During his closing argument, Harris' attorney highlighted the deficiencies in the dusting of the vehicle for fingerprints by Green and in the processing of the fingerprints by Green and Schmid. In addition, he noted that Huston typically gets the top ten results from AFIS and tests them, but that he only used the first one (Harris) in this case. He noted that Huston's procedure "was slightly altered." In addition, Harris' attorney noted that his fingerprint expert, Shipp, also identified the fingerprints as Harris'. However, he argued that he "had serious concerns about the independentness [sic] of Mr. Shipp's examination," because Huston was in the room with him when he examined the fingerprints and he knew Huston's results. Harris' attorney also thoroughly addressed potential deficiencies in Colvin's investigation and in the testimony of Mrs. Greene. Accordingly, prior to Greene's attorney's presentation of his closing argument, the jury had been presented with a thorough closing argument by Harris' attorney, challenging the fingerprint evidence.
 {¶ 38} Greene's counsel also challenged the fingerprint evidence in his closing argument. He emphasized that the evidence technicians did not look for fingerprints in places that would normally be touched by a different driver, such as the door handles and mirrors. He also discussed how Huston had brought the latent print cards to trial and that he had never returned them to the prosecutor or the detective. Greene's attorney thus raised the issue of Huston's retention of information, i.e., the latent print cards, that could have been useful to further investigation of the crime.
 {¶ 39} Greene's counsel recognized, however, that "[t]his case, as far as Allen Greene is concerned, is fairly simple when you get away from all that. I guess what it boils down to is this: Do you believe Bettie Greene beyond a reasonable doubt?" We find no fault with that strategy. Although Harris' involvement in the offenses is founded on his fingerprints on the deposit slip, Greene's involvement as a co-conspirator is primarily based upon his wife's testimony. After discussing the issue of the reliability of the fingerprint evidence (after Harris' counsel had already addressed that issue), Greene's attorney reasonably focused on Mrs. Greene's evidence against her husband We find no basis to conclude that Greene's counsel was ineffective in his closing argument.
 {¶ 40} Greene's first assignment of error is overruled.
 {¶ 41} The judgment of the trial court will be affirmed.
Fain, P.J. and Young, J., concur.