OPINION
{¶ 1} On March 7, 2006, Joseph W. Huber (Appellant) was caught with a suitcase chock-full of thousands of narcotic pain-reliever and analgesic tablets-methadone, hydrocodone, oxycodone, fentanyl patches, and acetaminophen with codeine. He was convicted on five counts of controlled substance possession in back-to-back *Page 2 
trials (Huber I, No. 06-CR-509, and Huber II, No. 06-CR-674). The prosecutor's misidentification of the fentanyl patches in the original indictment required the state to reindict Mr. Huber, prompting the second trial three months later. The two trials spawned two appeals (this one and State v. Huber, Clark App. No. 07-CA-122), which we declined to consolidate.
 {¶ 2} This is the appeal from the first trial, Huber I, where the jury found him guilty on four counts of possession and the trial court sentenced him to a state penitentiary for 18 years (the statutory maximum). Mr. Huber assigns four errors and raises several issues, the most important of which are whether the search of the suitcase violated his Fourth Amendment rights, whether a card found in the suitcase bearing the inscription "To my love, Peanut, love Lisa," and testimony that his street name is "Peanut" were properly admitted into evidence, whether two jurors should have been dismissed for cause as biased and partial, and whether he was denied his right to a speedy trial under theSixth Amendment to the United States Constitution, Article I, Section 10
of the Ohio Constitution, or Section 2945.71 of the Revised Code.
 {¶ 3} The first assignment of error alleges the trial court wrongly overruled Mr. Huber's motion to suppress the drugs. He contends the search of the suitcase was warrantless and failed to satisfy an exception to the Fourth Amendment's warrant requirement. The only evidence offered at the suppression hearing was the testimony of Louis Turner, a sergeant in the Springfield Police Department who was present at the search. While the trial court did not make express findings of fact, Mr. Huber did not quarrel with the substance of his testimony. Here is what Sergeant Turner said.
 {¶ 4} In the early evening of March 7, 2006, in Springfield, Ohio, he and Detective *Page 3 
Scott Woodruff sat in an unmarked police car and watched a suspected drug house on North Belmont Ave. The police had received several complaints about this house, the majority from Major Rusty Garman of the Clark County Sheriff's Department. Major Garman could see the house from the nearby bingo hall, where he worked an extra-duty job. For several weeks, he had relayed to the Springfield police his suspicion, based on his observations, that this house was a hub of drug commerce. Major Garman reported he often watched a person walk into the house and then saw the same person walk out only a minute or so later. In other telling observations, said Sergeant Turner, he "said that they would leave with a gym bag or a suitcase and sometimes walk over the the Panama Club, which is across the street, and stay 10, 15 minutes and come back." (Tr. 31). Sergeant Turner said he credited Major Garman's suspicions because of the latter's experience. So Turner and Woodruff watched the house and saw activity that confirmed Garman's observations and suspicions.
 {¶ 5} Around 6pm, they watched a 1992 Chevy pickup truck pull near the house. The driver got out and walked into the house empty handed. Consistent with the pattern they, and Major Garman, had seen, the driver walked out a few minutes later carrying a suitcase, which he carried in a way that suggested it was heavy. The two officers watched as the driver swung the suitcase into the Chevy's open bed, got in the cab, and drove off; they decided to follow. "[W]hat caused you to follow him?", asked defense counsel. (Tr. 31). "[T]he gentleman leaves the house with a suitcase and throws it in the back of the truck," Turner replied, "there could be drugs in [there]." Id.
 {¶ 6} They ran the Chevy's plates as they followed, and they discovered John Huber was its registered owner and also the subject of an outstanding arrest warrant. *Page 4 
Although neither officer knew him, they knew a man drove the truck, so they flipped on their red lights.
 {¶ 7} After the truck stopped, Sergeant Turner approached the passenger, Detective Woodruff the driver. When asked their names, both men replied, "Joe Huber," but the passenger quickly corrected himself and said his was John Huber. Turner informed John of the arrest warrant and asked him to step out of the truck, where he arrested and handcuffed John. Searching him, Turner reached into his front pants-pocket and pulled out a small packet that contained a white powder, which he suspected (and later confirmed) was cocaine. Meanwhile, Detective Woodruff was busy with the driver, who, like John, was being combative and argumentative. Woodruff learned the driver's name was Joseph Huber, and Joseph was John's nephew.
 {¶ 8} Turner, his hands full with John, could not testify in detail about Woodruff's encounter with Joseph, but he did know that it was at some point after he had arrested John when Woodruff opened the suitcase. Inside they saw pill bottles and thousands of pills. Woodruff immediately arrested Joseph, who, Turner testified, likely would not have been arrested but for this discovery.
 {¶ 9} Mr. Huber contends that when Detective Woodruff opened the suitcase Woodruff violated his Fourth Amendment rights because the officer did not have a search warrant and the search was not justified by an exception to the warrant requirement. The state raises the threshold issue of whether Mr. Huber may challenge the search of the suitcase. It observes he has never claimed to own it. The proper inquiry, though, is not whether the accused owns the place searched but whether the accused has a legitimate privacy interest there. SeeRakas v. Illinois (1979), 439 U.S. 128, 140, 99 S.Ct. 421, *Page 5 58 L.Ed.2d 387. Although ownership is important to consider, one who, like Mr. Huber, simply possesses or controls property may also raise a challenge. Id. at 143 n. 12. But we will cease exploring further the murky and forbidding swamp of standing doctrine, because, regardless of what we would find there, we conclude the search did not violate theFourth Amendment.
 {¶ 10} A trial court's suppression decision presents a mixed question of fact and law. See State v. McNamara (1997), 124 Ohio App.3d 706, 710,707 N.E.2d 539. We accept the trial court's view of the facts, provided they are supported by competent, credible evidence, because "[w]hen considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." State v.Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. But we determine independently what the legal conclusion should be. See State v.Claytor (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906. Here, as we said, the trial court did not make express findings of fact, but neither was the testimony disputed, so we will assume the trial court accepted all of it.
 {¶ 11} While the Fourth Amendment's warrant requirement ordinarily renders a warrantless search "per se unreasonable," a warrantless automobile search is an exception. In California v. Acevedo the U.S. Supreme Court declared a police officer need not obtain a warrant before searching a container, lying in an automobile, that he has probable cause to believe conceals contraband. (1991), 500 U.S. 565,111 S.Ct. 1982, 114 L.Ed.2d 619. Officer Woodruff's search of the suitcase, then, was permissible if he had probable cause to believe he would find contraband inside.
 {¶ 12} Probable cause is a decidedly amorphous concept that invokes an *Page 6 
unstructured analysis. The Supreme Court has admitted that "[a]rticulating precisely what * * * `probable cause' mean[s] is not possible." Ornelas v. United States (1996), 517 U.S. 690, 695,116 S.Ct. 1657, 134 L.Ed.2d 911. Descriptions of it use words like "commonsense" and "nontechnical," and the Court has said it embodies "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates (1983),462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527. In the abstract, it means a reasonable basis for a particularized belief of guilt constructed from the totality of the circumstances. See Maryland v. Pringle (2003),540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed. 2d 769. A trial court will decide whether probable cause exists based principally on the historical facts, and "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."Ornelas, 517 U.S., at 696.
 {¶ 13} The facts of a case include not only the historical, sensory-based facts-what an officer saw, heard, felt, smelled, and perhaps tasted-but also the background facts known by resident judges and local law enforcement officers. Background facts are those facts, "though rarely the subject of explicit findings, [that] inform the judge's assessment of the historical facts." Id. at 700. A reviewing court does well not forget that such facts exist because "[a] trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts though the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." Id. at 699. Therefore, "[a]n appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." Id. at 700. *Page 7 
 {¶ 14} Here, three experienced officers believed the house on North Belmont Ave. was a likely hub of drug-related commerce. Turner knew Major Garman had watched people lug suitcases, and other bags, from the house. They saw Mr. Huber enter the house empty-handed and exit only a few minutes later with a heavy suitcase in hand; they also discovered cocaine on his uncle, the passenger, which fact alone can constitute probable cause to search a vehicle. See, e.g., Wyoming v. Houghton
(1999), 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (hypodermic needle found in driver's pocket plus his admission that he used it to take drugs gave officer probable cause to search vehicle for contraband);U.S. v. Johnson (C.A.7, 2004), 383 F.3d 538, 545-546 (stating that officer's "discovery of a banned substance (drugs) on [defendant's] person clearly provided him with probable cause to search"). The trial judge, resident in Springfield, concluded that Sergeant Turner and Detective Woodruff, both local police officers, had a reasonable basis for believing the suitcase in the Chevy's bed was loaded with drugs. We cannot say that as a matter of law the trial judge erred in his conclusion. We overrule the first assignment of error.
 {¶ 15} The second assignment of error alleges the trial court erred by admitting into evidence a card found in the suitcase and testimony from Officer Woodruff that Mr. Huber's nickname or "street name" is "Peanut," the card's addressee. When the prosecutor looked through the suitcase on the day of trial, he found a card with "To my love, Peanut, love Lisa" written on the outside. On the suitcase's inventory list the card was lumped together with other items under the heading "various items." Because the prosecutor had not discovered the card earlier, he had not provided a copy of it in his discovery responses or identified it as a potential exhibit. But Mr. Huber knew about the card a week before trial. *Page 8 
Counsel admitted seeing it while examining the contents of the suitcase with an expert. "Did you ask for a copy of it?" asked the judge. (Tr. 116). "No, I did not," she replied. Id.
 {¶ 16} Later on, the prosecutor asked Officer Woodruff whether he knew if Mr. Huber had a nickname or street name. Woodruff replied he was known on the street as "Peanut." Defense counsel objected to this testimony, arguing the prosecutor failed to establish Woodruff had personal knowledge of the name. But during a sidebar counsel revealed that her real fear was of the jury hearing a police officer say that he had a street name. Counsel expressed concern the jury would infer a criminal past, which had already been ruled inadmissible. Counsel argued she could not cross examine Woodruff about this testimony without opening the door for admission of his criminal history. The trial judge overruled the objection, saying that while testimony of his criminal history was inadmissible, the same was not true of his street name.
 {¶ 17} Mr. Huber, in the first of three arguments, contends the prosecutor violated Criminal Rule 16(B)(1)(c) by failing to produce the card in discovery and by failing to list it as an exhibit. This rule says, "Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant." Crim. R. 16(B)(1)(c).
 {¶ 18} He misinterprets this rule, however, because it does not require a prosecutor to disclose and produce all evidence the latter intends to use at trial. The plain language of *Page 9 
the rule requires only that the defendant be permitted to "inspect and copy" the evidence. "The police and the prosecutor need not take the defendant nor his counsel by the hand and sift through the belongings of the defendant for them since making these items available for inspection and copying, if so desired, is all that is required by these rules."State v. Mitchell (1975), 47 Ohio App.2d 61, 73, 352 N.E.2d 636.
 {¶ 19} Second, he contends the trial court should not have admitted the card because the prosecutor did not establish the card's chain-of-custody. "The State has the burden of establishing the chain of custody of a specific piece of evidence. State v. Barzacchini (1994),96 Ohio App.3d 440, 458, 645 N.E.2d 137. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' Evid. R. 901(A). In order to meet its burden in establishing the chain of evidence, `the state need only establish that it is reasonably certain that substitution, alteration, or tampering did not occur.' State v. Qualls (June 6, 1997), Clark App. No. 96 CA 68. Breaks in the chain of custody go to the weight afforded the evidence-not the admissibility of the evidence. State v. Jones (Mar. 31, 2000), Miami App. No. 99 CA 38." State v. Rajchel, Montgomery App. No. 19633, 2003-Ohio-3975, at ¶ 21.
 {¶ 20} Sergeant Turner, who claimed familiarity with the police department's property-handling procedures, testified that it was unlikely the card had been tampered with. On the day it was found, the suitcase, and its contents, were locked up and were accessible only to property-room personnel. The next morning, said Turner, it was moved into the department's secure property-storage system, where any movement of an item is recorded. While it is true that, as Mr. Huber suggests, it cannot be said for certain the card *Page 10 
was not substituted, altered, or otherwise tampered with, the rules of evidence do not require certainty to precede admissibility. He was free to raise doubts during cross examination, but there was enough evidence attesting to its authenticity that it could be properly admitted.
 {¶ 21} Finally, Mr. Huber contends the writing on the outside of the card is hearsay. "`Hearsay' is a statement," "an oral or written assertion," "offered in evidence to prove the truth of the matter asserted." Evid. R. 801(A), (C). And "[a]n `assertion' for hearsay purposes simply means to say that something is so, e.g., that an event happened or that a condition existed." State v. Carter (1995),72 Ohio St.3d 545, 549, 651 N.E.2d 965 (Citation omitted.).
 {¶ 22} What Mr. Huber alleges to be hearsay-"To my love, Peanut, love Lisa," (Tr. 119)-is not. Even if it could, perhaps, be read as Lisa asserting her love for Peanut, the prosecutor was not trying to prove that Lisa loved Peanut; rather, he was trying to link the suitcase to Mr. Huber.
 {¶ 23} Next, he argues the trial judge erred by allowing Officer Woodruff's testimony about his street name. He contends the prosecutor failed to lay a foundation of personal knowledge. Rule of Evidence 602 says, in pertinent part, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." The concern underlying this issue is one of competency; a witness is incompetent to testify about that which he has no firsthand knowledge. See State v. Fears (1999), 86 Ohio St.3d 329, 715 N.E.2d 136.
 {¶ 24} Here, there was sufficient evidence from which the trial judge could find that *Page 11 
Woodruff had personal knowledge of Mr. Huber's street name-during the sidebar discussion, counsel tacitly admitted as much. Thus, the trial court did not err by admitting either the card or the testimony, so we overrule the second assignment of error.
 {¶ 25} The third assignment of error alleges the trial court should have dismissed two jurors for cause. During voir dire, one juror admitted that Major Garman (a witness for the prosecution) was a family friend and also admitted that his (the juror's) entire family worked in law enforcement. But the juror also said neither fact would keep him from fairness and impartiality. A second juror expressed his belief that police officers, being specially trained, can more skillfully detect crime than can an untrained lay person, just as, he explained, anyone specially trained for a job can perform it more skillfully than can an untrained lay person. When asked by defense counsel whether he believed police officers could still make mistakes, he replied, "Absolutely." (Tr. 70). When counsel pressed him, asking whether he would nonetheless presume they would not make a mistake, he answered, "No, I wouldn't." Id.
 {¶ 26} Mr. Huber contends their statements make it clear that neither could have been fair and impartial, and the trial court ought to have dismissed them. Criminal Rule 24(C)(9) permits a juror challenge based on "enmity or bias toward the defendant or the state," and paragraph (14), a catch-all provision, permits a challenge "[t]hat the juror is otherwise unsuitable for any other cause to serve as a juror."
 {¶ 27} We find nothing in either juror's statements that evinces a bias or shows them partial toward the state or otherwise makes them unsuitable jurors. Simply knowing a witness does not make a potential juror ineligible to serve, nor does having police officers in the family make one incapable of fairness. The other juror, as the trial judge observed, *Page 12 
merely indicated he would give a bit more credibility to a witness's testimony concerning a matter in which the witness had been trained. We cannot say the court erred by refusing to dismiss either for cause.
 {¶ 28} Finally, Mr. Huber argues the trial court erred by preventing him from exercising a peremptory challenge. This, though, is an error different from the "for cause" error alleged in the third assignment of error, and it is not raised separately. An issue not raised by specific assignment of error is not properly before us, making it inappropriate to consider. State ex rel. DeMuth v. State Bd. of Edn. (1996),113 Ohio App.3d 430, 434, 680 N.E.2d 1314. And Appellate Rule 12(A)(2) permits us to disregard an assignment of error if an appellant "fails to argue the assignment separately in the brief." Because Mr. Huber failed to raise the peremptory challenge issue and the alleged error properly, we will not address either. We overrule the third assignment of error.
 {¶ 29} The final assignment of error alleges the trial court should not have overruled a motion to dismiss the charges on speedy-trial grounds. Over fourteen months elapsed between Mr. Huber's indictment in May 2006 and his trial in July 2007. The charges ought to have been dismissed, he contends, because the delay violated his right to a speedy trial under the Sixth Amendment to the United States Constitution, Article I, Section 10, of the Ohio Constitution, and 2945.71 of the Revised Code.
 {¶ 30} The Ohio Constitution "guarantees an accused th[e] same right" to a speedy trial as the U.S. Constitution does. State v. Hughes (1999),86 Ohio St.3d 424, 425, 715 N.E.2d 540. Neither right is self-executing, however. See State v. Butler (1969), 19 Ohio St.2d 55, 56,249 N.E.2d 818. "Affirmative action on the part of an accused in the nature of a demand to be tried is necessary to invoke the constitutional protection." Id. at 56-57. *Page 13 
That is, "An accused is not entitled to a discharge for delay in bringing him to trial unless it appears that he resisted postponement, demanded a trial, or made some effort to procure a speedier trial than the state accorded him." Id. at paragraph one of the syllabus. "A defendant's failure to take such affirmative action," we have said, "results in a waiver of the ability to assert error based on constitutional speedy trial grounds." State v. Simons, Champaign App. No. 2003-CA-29, 2004-Ohio-6061, at ¶ 42, citing Butler.
 {¶ 31} Mr. Huber asserted his constitutional rights for the first time on the day of trial; by then he had waived them.
 {¶ 32} Mr. Huber points out that fourteen months exceeds the 270-day period imposed by Ohio's speedy-trial statute. See R.C. 2945.71(C)(2). The state responds that the period was tolled, as R.C. 2945.72 permits, so the trial court could respond to the various motions he filed. Further tolling the period was the continuance he requested and was granted, and the necessary continuances ordered sua sponte by the trial court. After reviewing the record, including the numerous docket entries of the motions he filed, [1] we agree with the state that the 270-day period was necessarily and reasonably tolled and had not yet elapsed on the day of his trial.
 {¶ 33} But does R.C. 2945.71 control? Code section 2941.401 reads, "[w]hen a *Page 14 
person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days after he causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter * * *. If the action is not brought to trial within the time provided, subject to continuance allowed pursuant to this section, no court any longer has jurisdiction thereof, the indictment, information, or complaint is void, and the court shall enter an order dismissing the action with prejudice." We follow "the great weight of authority," found among our sister courts, that holds "once a person under indictment has begun serving a prison sentence in another case, the provisions of R.C. 2941.401 apply, to the exclusion of the provisions of R.C. 2945.71, et seq., so that the running of speedy trial time under the latter statute is tolled." State v. Stewart, Montgomery App. No. 21462, 2006-Ohio-4164, at ¶ 22.
 {¶ 34} When he was arrested in this case, Mr. Huber was free on bond in an unrelated robbery case (No. 05-CR-458). At the end of March 2006, he pleaded guilty to the robbery charge and received a four-year prison sentence, which he began serving on April 5, 2006. Thus, R.C. 2941.401, and its 180-day speedy-trial period, superseded R.C. 2945.71 when he was indicted in this case on May 8, 2006.
 {¶ 35} So the speedy-trial question here is actually whether the 180-day period had elapsed. Critical to note is that the 180-day period does not begin to run until a defendant asks, in writing, that the charges be addressed. See Stewart, at ¶ 21. Mr. Huber failed to *Page 15 
do this. Therefore, he had no ground on which to assert his speedy-trial right. See id. at ¶ 23. We overrule the final assignment of error.
 {¶ 36} Finding no error, we affirm the judgment of the trial court.
DONOVAN, P.J., and FAIN, J., concur.
Copies mailed to:
Amy M. Smith, Robert L. Mues, Shawn P. Hooks, Hon. Richard J. O'Neill.
[1] The motions he filed include these: Pro se Motion for the Appointment of an Independent Laboratory Analyst under R.C 2925.51(E), filed June 29, 2006; Pro se Motion to Merge Indictments as Allied Offenses, filed July 11, 2006; Pro se Motion to Dismiss Charges, filed July 11, 2006; Appointment of counsel, filed July 13, 2006; Motion for Bill of Particulars, filed July 14, 2006; Motion for Discovery, filed July 14, 2006; Motion for Independent Expert, filed October 12, 2006; Motion to Suppress, filed January 5, 2007; Motion in Limine asking court to prohibit mention of a firearm, filed January 17, 2007; Motion for Grand Jury Transcript, filed January 17, 2007; Motion in Limine asking court to exclude particular evidence, filed March 20, 2007; hearing on Motion to Suppress, held March 20, 2007; Motion to Compel discovery, filed July 3, 2007; motion requesting hearings on three motions, filed July 3, 2007. *Page 1