[Cite as *State v. Garrison*, 2012-Ohio-3846.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

     Plaintiff-Appellee                           :           C.A. CASE NO.    24857

v.                                                    :           T.C. NO.    10CR3387/4

CHRISTOPHER J. GARRISON                               :           (Criminal appeal from
                                                   Common Pleas Court)

     Defendant-Appellant                          :

                                                             :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    24th    day of    August   , 2012.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JOHN S. PINARD, Atty. Reg. No. 0085567, 120 W. Second Street, Suite 703, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Christopher Garrison,

filed October 20, 2011. Garrison appeals from his October 18, 2011 Judgment Entry of Conviction, following pleas of no contest, to one count of aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), and one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), both felonies of the first degree. An additional charge of kidnapping was dismissed. The court merged the aggravated robbery and aggravated burglary offenses, and the State elected to proceed to sentencing on the aggravated robbery (deadly weapon) offense. Garrison received an agreed five year sentence. Garrison's arguments on appeal relate to his motion to suppress, filed on December 2, 2010, which the trial court overruled after a hearing. We hereby affirm the judgment of the trial court.

{¶ 2} By way of background, Garrison's co-defendants, namely Antwon Cosby, David Blane, and Javian Blake Harris, also moved the court to suppress evidence, and the court heard all the suppression motions at a hearing that began on February 16, 2011. At the hearing, T.J., age 12, testified that on October 20, 2010, just before noon, he was sleeping in his bed, on Bercham Drive, Huber Heights, having stayed home from school due to illness. T.J. stated he was alone in his home when one of the family dogs began barking and awakened him. He testified that he told the dog to be quiet and went back to sleep, but the dog began to bark again. When T.J. awoke for the second time, he observed a tall man with a bushy ponytail and a mustache in his bedroom, wearing a black hoodie, black pants, and black shoes. T.J. stated that the man carried a gun, and he asked T.J. where his step-father was. T.J. testified that after he told the man that he did not know his step-father's whereabouts, the man pointed the gun at him and told him to get under the covers. The man then removed T.J.'s laptop computer from his bedside table and left the room. T.J. further testified that he observed a second man, who was

wearing gloves, standing near his bedroom door.    T.J. stated that he also heard someone else in the house whom he could not see.

{¶ 3}    T.J. testified that he remained in his room under the covers until the police arrived.   He stated that his parents also arrived, and an officer then drove him, his mother and his step-father to view suspects who had been detained.   At the first location, T.J. testified that he was shown three men, one at a time.   T.J. stated that he identified the man wearing the gloves, suspect Javian Blake Harris.   T.J. stated that he was taken to another location where he was shown two more men, one at a time.   T.J. testified that he identified the second man as the man with the ponytail who pointed the gun at him, suspect David Blane.

{¶ 4}    Stephen Hurst testified that at the time of the robbery, he was sitting in his car in front of Rushmore Elementary school, on Bercham Drive, between 11:30 and 11:45, waiting for his daughter.   While he was "fidgeting in the seat," Hurst stated that a vehicle pulled up about a car's length ahead of his.   He testified that he looked up and observed a man get into the right rear passenger side of the vehicle and crawl across the back seat to the driver's side.   Hurst stated that he also observed another man waiting to get into the vehicle, who was wearing latex gloves and carrying a laptop computer.   Hurst stated that he observed a third man carrying a "big T.V." exit a nearby house and also get into the backseat of the vehicle.   Hurst stated that he did not see the driver of the vehicle.   Hurst testified that he believed a robbery was in progress, and he phoned the Huber Heights Police Department.   When the officers arrived, Hurst testified that he advised them of the direction in which the vehicle departed.   Hurst stated that he was subsequently contacted by the officers, and he met them an hour after the robbery at a separate location, where he was shown three suspects, one at a time.   Hurst stated that he recognized the

second suspect as the man wearing the latex gloves and carrying the lap top. Hurst testified that he was then taken to another location and shown two more suspects, and that he recognized the second man there as the man carrying the television. Hurst identified Blane and Harris in the courtroom as the two suspects he identified during the show up.

{¶ 5} The suppression hearing resumed on March 2, 2011. Deputy Jonathan Miller of the Montgomery County Sheriff's Office testified that he was working alone in a marked cruiser when he detained Garrison, and he testified as follows regarding the relevant sequence of events:

Q. * * * At some point in time, did you have occasion to go to the area of Klepinger Road?

A. Yes, I did.

Q. Can you tell us what it was that brought you to that location?

A. We had received information through our computer system of an aggravated burglary that occurred in the city of Huber Heights. They put out a vehicle description and plate number and saying that when you ran the plate it came back to Harrison Township just off Klepinger Road.

Q. * * * And so as a result of that, is that the reason you went to that area?

A. Correct.

Q. * * * And when you got to that area, did you learn anything else?

A. Yes, I'd heard that - - we have volunteers that had said they saw a car that kind of - - they described - - that matched that description. They lost it. But a little short time later, Deputy Chaney had advised that he had the car in a * * * driveway and all the individuals inside had bailed.

Q. * * * And was the area where the vehicle was, was it close in location to this Klepinger Road?

A. Yes.

Q. * * * Same neighborhood?

A. Correct.

Q. * * * Now, did you have specific descriptions of individuals that had bailed from the car?

A. Yeah, the one - - one in particular was a black male, blue jeans, wearing a white T-shirt, was walking down Klepinger Road.

Q. And do you recall, if you recall, who you got that information from?

A. I believes (sic) it was deputy Barnes.

Q. * * * And as a result of hearing that information, what did you do?

A. Went down - - south on Klepinger and about that time I was just south of Haney Road, observed a black male wearing a white T-shirt and blue jeans, walking.

Q. * * * And what did you do?

A. Exited my cruiser, pulled my service weapon out, ordered him to the ground. He complied.

Q. * * * And were you able to ascertain the identification of this person?

A. Yes.

Q. And how did you get the identification of the person?

A. I asked him what his name was, if he had an ID on him. He told me,

"Yes, I do, my jail ID." Prison ID was in his back pocket.

Q. * * * And what name did he give you?

A. Christopher Garrison.

Q. * * * And - - so, at this point is he on the ground?

A. Yes.

Q. Is he at gunpoint?

A. He's handcuffed now.

Q. * * * And what happens next?

A. Secured him in the rear seat - - rear seat of my cruiser, relocated to Ar[k] and Klepinger which is a couple hundred feet down the road. And asked him, you know, what was he doing in this area.

He proceeded to say he was there visiting a friend on Ar[k]. Asked him to point out how far down the road this house was at. He changes his story to he was - - he walked over to that area from Northland Village Apartments, which is on the east side of Harrison, to meet a friend.

Q. * * * - - at this time you indicated he was handcuffed.

A. Correct.

Q. Why was he handcuffed?

A. For my safety.

Q. * * * Was he under arrest at that point?

A. No.

Q. * * *  - - but did you have control of him?

A. Yes.

Q. * * * When he made these statements to you, was he in your police cruiser or was he outside of your police cruiser?

A. Inside my cruiser.

Q. * * * Did you know for certain whether or not this individual was involved in the incident you were responding to the area for?

A. No, I did not.

Q. * * * Did you read this person their rights before these statements were made?

A. No, I did not.

Q. * * * And why did you not do that?

A. At this time I didn't know that he was even a - - a considered suspect. I was just ascertaining why he was even in the neighborhood.

Q. * * * At the time you indicated that he made some statements and then changed his statements; correct?

A. Correct.

Q. And what were your thoughts on that?

A.. At that time I started believing that, you know, his story certainly did change. He's - - might be involved. He's trying to think of different things.

Q. * * * Do you continue asking him questions at that time?

A. I made a statement to why would your friend want you to meet him on Ar[k], walk from Northland to meet you on Ar[k] when you're - - it's like a two -

or three-mile walk, when he could have picked you up at Northland.

Q. Did he respond to that?

A. He did respond. He stated he didn't know, it's just what his friend had asked him to do.

Q. * * * At that point did you ask him any further questions?

A. No, I did not.

Q. * * * Was a suspect (sic) in your mind at that point?

A. Yes, he was.

Q. * * * Did you ask him any further questions after that at all?

A. No.

Q. * * * What did you do with him after that?

A. He remained in my cruiser. A short time later the City of Huber Heights had - - I'm assuming witnesses or something came around and asked for a live ID. The citizens standing by while he stepped out of the cruiser. And then turned him over to Huber Heights Police Department.

Q. * * * And so he was in your cruiser at the time of, what we call the show-up?

A. Right.

Q. * * * And did you actually take him out of your cruiser for the show-up?

A. Yes.

Q. Did you have any conversation with either of the witnesses that were

on the opposite end of the show-up, the ones that were there to ID?

A. No, I never saw them.

* * *

Q. Did you participate any further in the investigation after you assisted with taking the individual out of the car for the show-up?

A. No.

Miller stated that Garrison's tone was initially calm but that he then became "a little nervous." Miller testified that he did not threaten Garrison or make any promises to him in exchange for his answers, and that Garrison did not indicate that he did not want to talk to him, or ask for an attorney. Miller stated that Garrison did not appear to be under the influence of alcohol or drugs, and that other than changing his story, he responded appropriately to his questions.

{¶ 6} On cross-examination, Miller testified that the suspect vehicle was registered to an address on Maple Leaf Drive, which intersects Ark Avenue, and that Ark Avenue dead ends into Klepinger, where Garrison was apprehended. Miller testified that he was 15-20 feet away from Garrison when he got out of his cruiser to approach him. Miller stated that he did not activate his lights or siren. Miller testified that when Garrison got on the ground, he "immediatley told him to put his hands out to the sides and went up and placed my service weapon in my holster, and placed handcuffs on him." Miller stated that he detained Garrison for purposes of investigation, and that he advised dispatch that he had "the male walking down Klepinger detained." Miller stated that he proceeded to the intersection of Ark Avenue and Klepinger Road with Garrison to establish a perimeter, since all of the robbery suspects had not been apprehended. Miller stated that they remained in the cruiser for about a half an hour, until

the show-up ID occurred.

{¶ 7} Robert Schommer, Chief of Police for the City of Huber Heights, testified that he transported Garrison to the Huber Heights Police Department after he had been apprehended. Schommer stated that he did not advise Garrison of his rights or ask him any questions, but that Garrison provided unsolicited statements. Schommer testified that Garrison told him that he did not know what was going on, and that he "was walking back from * * * a girlfriend's house at Northland Village, heading back to Third Street * * *," when he was approached by a deputy. Schommer stated that he did not ask any questions of Garrison following these statements. Schommer testified that Garrison was coherent and did not appear to be under the influence of drugs or alcohol. According to Schommer, he did not raise his voice to Garrison, threaten him, or make any promises, and he stated that Garrison did not ask for an attorney. On cross-examination, Schommer stated that when he took custody of Garrison he was already under arrest and not free to leave. Schommer stated that Garrison was in handcuffs at that time.

{¶ 8} Jeffrey Colvin, a detective with the Huber Heights Police Department with 18 years experience, testified that he learned of the robbery from a radio broadcast, while he was in Bellbrook with Detective Mike Noll, following up on a separate case. Colvin testified that he contacted dispatch and learned that an eyewitness had provided the license plate number of the vehicle used in the robbery, which was registered to an address on Maple Leaf Drive in Harrison Township. Colvin and Noll proceeded to the area of the Maple Leaf Drive address, according to Colvin. Upon arrival in the area, he stated that he observed that responding officers had already detained three men on nearby Fleetwood Drive. After speaking with detainees Kuron Evans and Antwon Cosby, Colvin stated that he and Noll proceeded to 4142 Maple Leaf,

where Sharon Cosby provided written consent to search her vehicle, whose license plate matched that provided by a witness. Colvin testified that the victims were then brought to the scene, where they identified their property in Sharon Cosby's car that had been taken from their home.

{¶ 9} Colvin identified a photocopy of the original rights form he later read to Garrison when he interviewed him at the police department in an interview room. Colvin stated that he read each individual right to Garrison and had him place his initials by each right to indicate his understanding thereof. Colvin testified that Garrison indicated that he had nine years of schooling and that he is able to read and write. Colvin stated that Garrison signed the form at the bottom and agreed to speak to him. Colvin stated that Garrison did not ask any questions. According to Colvin, he did not make any threats or promises to Garrison. Colvin testified that Garrison never asked to stop the interview, for anything to eat or drink, or for an attorney. Colvin stated that Garrison did not appear to be under the influence of drugs or alcohol and answered his questions coherently. Colvin stated that the interview lasted 25 minutes. The record does not reveal whether Garrison made incriminating statements during this interview either verbally or in writing.

{¶ 10} In overruling the defendants' motions to suppress, the trial court determined in relevant part, after summarizing Miller's testimony regarding his contact with Garrison as recited above, as follows:

> As to the statements made by Defendant Garrison to Deputy Miller, the distinction to be drawn is whether the nature and amount of force exerted upon Defendant Garrison transcended that necessary for an investigative detention

under *Terry* and converted the detention into a custodial arrest during which an interrogation occurred without a preceding Miranda advisement. Defendant Garrison had been taken to the ground, handcuffed, and placed in the rear of a marked cruiser. This level of force is generally more consistent with a custodial arrest than a brief, non-custodial investigative detention. However, Defendant Garrison matched the general description of one of the men that had fled the automobile suspected to be associated with an armed home invasion. The force used, given the nature of the suspected offense and the possible presence of a firearm, was commensurate with the reasonable risk perceived by the investigating officer. * * *

The totality of the circumstances show a detention for further investigative inquiry, not an arrest at the time of Deputy Miller's question. That detention then evolved into a probable cause basis for Defendant Garrison's arrest and transport to the Huber Heights police department for additional questioning. The further investigative inquiry consisted of asking Defendant Garrison to explain why he was in the vicinity. Defendant Garrison's explanation was implausible from the perspective of the investigating officer, increasing the likelihood that Defendant Garrison had been one of the individuals that had fled from the vehicle. Flight, present here, colors otherwise innocent behavior and is accorded substantial weight in a probable cause determination. * * * Given that Defendant Garrison matched the description of one of the individuals that had fled from the vehicle and he offered a fluid, if not implausible explanation for his presence in the

vicinity, probable cause then arose for Defendant Garrison's arrest. Probable cause is information sufficient to justify a reasonably prudent person in believing that an offense was committed and the arrestee committed it. Probable cause is more than mere suspicion, but less than proof beyond a reasonable doubt. This is consistent with Chief Schommer's assessment that when he took possession of Defendant Garrison for transport to the Huber Heights police department, Defendant Garrison was under arrest at that time. Consequently, the statements by Defendant Garrison to Deputy Miller will not be excluded. His spontaneous, unsolicited statements to Chief Schommer and post Miranda advisement statements to Det. Colvin are not subject to exclusion. Given that probable cause existed for Defendant Garrison's arrest, his motion to suppress based upon an arrest lacking in probable cause is overruled, as well as Defendant Garrison's fruit of the poisonous tree arguments.

{¶ 11} Garrison asserts one assignment of error with several subparts as follows:

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS THE EVIDENCE IN THIS CASE AS IT WAS OBTAINED IN VIOLATION OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO BE FREE OF UNREASONABLE SEARCHES AND SEIZURES.

1. The Officer Did Not Have Reasonable, Articulable Suspicion to Detain Mr. Garrison.

2. The Officer Erred in Arresting Mr. Garrison without Probable Cause.

3. Statements Made by Mr. Garrison Were Taken in Violation of His Miranda Rights.

4. The Evidence Obtained from Mr. Garrison is Subject to the Exclusionary Rule.

**{¶ 12}** The State responds that Garrison "is really making three separate arguments for why his conviction should be reversed," and further that "[b]ecause the police acted reasonably in stopping Garrison as part of an investigative detention, questioning him as part of that investigation, and arresting him after the investigation led to probable cause to believe he was involved in the burglary, the trial court properly overruled Garrison's motion to suppress."

### I.  Reasonable, Articulable Suspicion

**{¶ 13}** As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) .   At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted).   The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted).   In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted).   An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence."

*State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

**{¶ 14}** The Fourth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to   be searched, and the persons and things to be seized." Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained.  *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).   "* * * The exclusionary rule applies not only to primary evidence directly obtained by police during an illegal search or seizure but also to 'derivative evidence,' that is, evidence discovered from knowledge gained by the police as a result of the illegal search or seizure. * * * .   Derivative evidence is known as 'fruit of the poisonous tree.' * * *."   *State v. Anderson*, 2d Dist. Clark Nos. 2009-CA-60, 2009-CA-61, 2011-Ohio-22, ¶ 23.

{¶ 15}   As this Court has previously noted:

"The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.  *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.  Not all interactions between citizens and the police, however, constitute a seizure.  Rather, the interactions between citizens and law enforcement officers can fall within three distinct categories: a consensual encounter, an investigative detention, and an arrest.  *State v. Taylor* (1995), 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60.

* * *

"An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. * * * Under *Terry*, police officers may

briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. * * * . 'Reasonable suspicion entails some minimal level of objective justification for making a stop - that is, something more than an inchoate and unparticularized suspicion or "hunch" but less than the level of suspicion required for probable cause.' *State v. Jones* (1990), 70 Ohio App.3d 554, 556-557, 591 N.E.2d 810. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *State v. Heard*, Montgomery App. No. 19323, 2003-Ohio-1047, at ¶ 14, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271. * * *.

"The final category is a seizure that is the equivalent of an arrest. 'A seizure is equivalent to an arrest when (1) there is an intent to arrest; (2) the seizure is made under the real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested.' *Taylor*, 106 Ohio App.3d at 749 [667 N.E.2d 60]. An arrest must be based on probable cause." (Citation omitted). *State v. Lewis*, Montgomery App. No. 22726, 2009-Ohio-158, 2009 WL 105635,¶ 20-23.

*State v. Curtis*, 193 Ohio App.3d 121, 2011-Ohio-1277, 951 N.E.2d 131, ¶ 18-21 (2d Dist.).

{¶ 16} "'The Fourth Amendment does not require a

policeman who lacks the precise

level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may simply be the essence of good police work to adopt an intermediate response. * * *.'" *State v. Freeman*, 64 Ohio St.2d 291, 295-96, 414 N.E.2d 1044 (1980). Further, a "'brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time.' * * * ." *Id.*, 296.

{¶ 17} "Handcuffing a suspect in the course of an investigative detention does not necessarily turn that investigative detention into an arrest, so long as handcuffing is reasonable under the circumstances; for instance, to maintain the status quo and prevent flight." *State v. Carter*, 2d Dist. Montgomery No. 21145, 2006-Ohio-2823, ¶ 20.

{¶ 18} Finally, this Court has previously determined:

> [P]olice officers are entitled to rely on information received from other police officers. If an officer detains an individual suspected of criminal behavior in reliance on information received from a fellow officer, who has a reasonable suspicion to make a stop, he need not have independent grounds for suspecting criminal activity but may rely on the information given via the dispatch. However, the state must prove that the officer who provided the information had a valid reasonable suspicion of criminal activity.

*State v. Wortham,* 145 Ohio App.3d 126, 130, 2001-Ohio-1506, 761 N.E.2d 1151 (2d Dist.).

{¶ 19} Garrison directs our attention to *State v. Whitson*, 10th Dist. Franklin No. 01AP-819, 2002-Ohio-683, which he argues is analogous to the matter herein. Whitson was convicted of carrying a concealed weapon, and on appeal he argued that the trial court erred in overruling his motion to suppress. At the suppression hearing, Sergeant Householder testified that he was dispatched to the scene of a robbery at an "Easy Mart," and that the suspects were described as "'three black males wearing dark clothing, some of them with hats.'" Householder testified that he "drove around the parking lot of Northland Shopping Center which was nearby. Because the time was near midnight, no stores in the mall were still open. A chain link fence separated the area where the Easy Mart was located from the mall parking lot." The officer observed Whitson, an African America male "wearing a blue coat and dark pants," as well as a "head covering," and the officer testified that he believed that Whitson "fit the description of the robbers."

{¶ 20}   After reviewing the standards set forth in *Terry*, the Tenth District reversed and remanded the matter.   The court noted that while the dispatch described three black males, Whitson was walking alone, and the court further concluded as follows:

Police had very little in the way of a description of the robbers, other than their number and their race.   Most people in Ohio wear dark clothing and coats in late November.   Some males wear hats and some do not.   The information provided to Sergeant Householder was of little or no use in determining if an individual African-American male was involved in the robbery.   In short, Sergeant Householder did not have "specific and articulable facts" to justify frisking Mr. Whitson.

Sergeant Householder had the right to approach Mr. Whitson and ask him questions.   Sergeant Householder even had the right to ask permission to search Mr. Whitson.   However, Mr. Whitson had the right to refuse to answer the questions and to refuse the permission to search.

{¶ 21}   Having considered the totality of the circumstances, we conclude that *Whitson* is distinguishable and that Miller possessed a reasonable and articulable suspicion to detain Garrison.   In *Whitson*, as the Tenth District determined, Householder knew little of the suspects besides their number and their race, and further, Whitson was apprehended in an area separated by a chain length fence from the scene of the robbery.   In contrast, Miller had been advised of an aggravated burglary, and he was aware that the vehicle connected thereto was registered to an address "just off Klepinger Road."   For those reasons, he immediately proceeded to the area. Miller learned that Deputy Chaney had located the vehicle near Klepinger Road, and that the

occupants had fled on foot, one of whom was a black male, wearing blue jeans and a white tee shirt, who was walking down Klepinger Road. When Miller proceeded south on Klepinger Road, he observed Garrison, alone and on foot, wearing jeans and a white tee shirt. Miller subsequently advised dispatch that he had "the male walking down Klepinger detained." As the State asserts, Miller was entitled to rely upon the information received from the officers involved in the investigation of the robbery, and Garrison's appearance and location were consistent with that information. *Terry* does not require certainty or probability that criminal activity is afoot, and we conclude Miller possessed the reasonable, articulable suspicion necessary to detain Garrison for further investigation.

{¶ 22} Finally, Miller indicated that he handcuffed Garrison for his safety, and we conclude that the use of handcuffs under these circumstances did not turn the investigative detention into an arrest. While we acknowledge that being ordered to the ground at gunpoint and handcuffed is a more extreme form of detention than used under most *Terry* stops, as the trial court indicated, Miller was investigating felony offenses of violence which involved flight by the perpetrator(s). Miller was alone at the time he approached Garrison, and we agree with the trial court that the use of force by Miller under the circumstances was appropriate.

## II. Probable Cause

{¶ 23} Garrison next asserts that probable cause did not exist for Garrison's arrest. "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime. * * * ." *State v. Adams,* 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7. "[P]robable cause is a concept that must be based on the totality of the circumstances, because it "'deals with probabilities - the factual and nontechnical considerations

of everyday life on which reasonable and prudent men act.'" * * * ." *State v. Etherington,* 172 Ohio App.3d 756, 2007-Ohio-4097, 876 N.E.2d 1285, ¶ 20 (2d Dist.). "In the abstract, it means a reasonable basis for a particularized belief of guilt constructed from the totality of the circumstances. * * * A trial court will decide whether probable cause exists based principally on the historical facts, and 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.' * * * ." *State v. Huber*, 2d Dist. Clark No. 07-CA-88, 2009-Ohio-1636, ¶ 12.

{¶ 24} As we determined above, Miller detained Garrison based upon reasonable suspicion that he was involved in the robbery. Probable cause to believe that Garrison was involved in the robbery then evolved from Miller's further investigation. Specifically, Garrison changed his story about the reason for his whereabouts in the area, which led Miller to believe that Garrison was "trying to think of different things" because he "might be involved" in the robbery. We conclude that the historical facts herein support the belief of a reasonably prudent person that Garrison committed a crime, namely that he was observed near an area from which multiple suspects had recently fled, he matched the description of one of those suspects, and his explanation regarding his whereabouts was "implausible" from Miller's perspective, increasing the likelihood that Garrison was involved in the robbery. In other words, probable cause existed for Garrison's arrest.

## III. *Miranda* Rights

{¶ 25} Garrison next asserts, "[a]fter placing Mr. Garrison under arrest, the officer proceeded to ask Mr. Garrison a series of questions regarding his presence in the neighborhood," in violation of his *Miranda* rights.

{¶ 26}     "In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court held that the State may not use statements from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination.    *Id*. at 444."    *State v. Beaty,* 2d Dist. Montgomery No. 24048, 2011-Ohio-5014, ¶ 15.   A person detained pursuant to *Terry* is not "in custody" for purposes of *Miranda*.    *State v. White*, 2d Dist. Montgomery No. 18731, 2002-Ohio-262, 2002 WL 63294, * 4.

{¶ 27}     Since Garrison was initially detained pursuant to *Terry*, *Miranda's* procedural safeguards were not implicated, and  the questions Miller asked of Garrison regarding his presence in the neighborhood were not tantamount to interrogation.   Significantly, the statements made by Garrison to Miller were exculpatory and not incriminating in nature.   Further, as the trial court noted, Garrison's statements to Schommer were spontaneous and unsolicited (and likewise exculpatory), and Schommer did not ask Garrison any questions while transporting him to the police department. Finally, as Colvin's testimony establishes, his interview of Garrison occurred after he was properly advised of his *Miranda* rights and signed an acknowledgment thereof, and agreed to speak to Colvin.

{¶ 28}     Since the officers did not obtain any evidence from Garrison illegally, the exclusionary rule and the fruit of the poisonous tree doctrine do not apply.   There being no merit to Garrison's assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Andrew T. French
John S. Pinard
Hon. Mary L. Wiseman